**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

IN RE:

Christine Aiken Govan,

Debtor.

C/A No. 16-00056-DD

Chapter 13

**ORDER DENYING CONFIRMATION**

This matter is before the Court for confirmation of a chapter 13 plan proposed by Christine Aiken Govan ("Debtor") on January 22, 2016 [Docket No. 11]. Vanderbilt Mortgage and Finance, Inc. ("Vanderbilt") objected to confirmation of Debtor's plan on January 27, 2016 [Docket No. 13]. A confirmation hearing was held on May 9 and 10, 2016. At the conclusion of the hearing, the Court took the matter under advisement. The Court now issues the following findings of fact and conclusions of law.

## FACTS

1.   Debtor filed her chapter 13 bankruptcy case on January 4, 2016. On January 22, 2016, Debtor filed her schedules and statements [Docket No. 10]. On her Schedule A/B, Debtor listed a 2007 Clayton Lone Star 32 x 72 mobile home. The Schedule A/B indicates that the mobile home is personal property and is not attached to real property Debtor owns at 29 Mary Joye Lane, Orangeburg, SC 29118. Debtor listed the value of the mobile home as $27,100.00 and the value of the real property as $10,500.00, for a total value of $37,600.00.

2.   Debtor listed on her Schedule D a debt owed to Vanderbilt in the amount of $83,728.00 secured by the mobile home and the real property located at 29 Mary Joye Lane. Vanderbilt filed a proof of claim in Debtor's case on January 11, 2016, listing the debt owed as $83,727.37.

3. Debtor filed her chapter 13 plan on January 22, 2016 [Docket No. 11]. Debtor's plan proposes to value the mobile home and real property together at $37,600. The plan proposes trustee payments of $920.00 per month for fifty-seven months, with Vanderbilt being paid $747.00 per month at 5.25% interest.

4. Vanderbilt filed its objection to confirmation of Debtor's plan on January 27, 2016 [Docket No. 13]. In its objection, Vanderbilt asserts that the valuation of the mobile home is too low. In the joint statement of dispute filed by the parties on March 9, 2016, Vanderbilt asserted that the combined value of the mobile home and real property is $57,100 [Docket No. 15].

5. The parties indicated at the confirmation hearing that they agree the value of the real property is $11,250.00; thus, the only remaining disputed issue was the value of the mobile home.

6. Debtor testified that she believes the value of the mobile home is $29,000.00. When questioned further about the basis for this opinion, Debtor was unable to identify any source she relied on to form her opinion. Debtor did not have an appraiser or any other witness testify regarding the value of the mobile home.[1]

7. After she testified as to her opinion of the mobile home's value, Debtor prepared an appraisal of the mobile home on the National Automobile Dealers Association ("NADA") website as a demonstration for the Court. The appraisal indicated the base structure value of the mobile home was $27,643.00 and after being discounted for the condition of the home, which Debtor identified as "poor," the total adjusted retail value for the home, with optional equipment, was $25,896.15.

---

[1] At the hearing, Debtor's counsel indicated that Debtor had retained an appraiser in connection with this matter, but that the appraiser had withdrawn just prior to the hearing.

8. In support of its assertion of the mobile home's value, Vanderbilt introduced testimony from Mr. Walter Banks, who prepared an appraisal for Debtor's home. Mr. Banks has been involved in the mobile home industry for approximately 40 years and testified he has been performing mobile home appraisals for ten years. Mr. Banks holds a certification in mobile home valuation from the National Appraisal System. He testified that he has appraised hundreds of mobile homes for the purpose of determining their replacement value and has been qualified as an expert on mobile home valuation at least two hundred times. Mr. Banks was qualified as an expert in this case as to mobile home valuation.

9. Mr. Banks testified that to arrive at the value contained in his appraisal, he started with the base "box" for the particular make and model of mobile home, which contains only the very basic features of the home.

10. Mr. Banks testified that NADA arrives at base "box" values in one of two ways. The first way is using actual retail sales of mobile homes of the same make and model, both nationwide and locally. The second way is using supplemental values, which is only used if all information necessary to locate like mobile home sales to the one being valued is not available. Supplemental values use "worst case" assumptions – meaning they use lower quality, base options and materials. Mr. Banks testified this means that when supplemental values are used, valuations are typically lower.

11. Mr. Banks testified that this particular make and model of mobile home was originally manufactured for sale in states other than South Carolina and therefore, when data is input into the NADA system, NADA would normally default to supplemental values because it would not locate sales of this particular make and model in South Carolina. However, Mr. Banks testified that his system allows him to opt out of using supplemental values and perform additional

research to determine the proper base value. Mr. Banks testified that he did this in completing his appraisal of Debtor's home.

12.     Once the base value of the home is determined, adjustments are made for home size, location, and condition,[2] and value is then added for the components and accessories with which the particular home is equipped.

13.     Mr. Bank's appraisal indicated that the total value of the mobile home is $44,600.

14.     Debtor introduced into evidence thirty-three (33) pictures of both the interior and the exterior of the mobile home. The pictures show numerous issues with the mobile home, including, among other issues, warped vinyl siding, missing or broken skirting, holes in the interior walls, peeling linoleum flooring, wrinkled and damaged carpeting, and missing kitchen cabinet doors. Debtor testified that these issues with the mobile home contributed to her estimate of the home's value at $29,000.00. However, Debtor testified that she was not aware of any structural problems with the home.

15.     Mr. Banks' appraisal listed the overall condition of the home as "good." The condition guidelines listed in Mr. Banks' appraisal include the following explanations:

**Excellent** – Home is new, or like new, very attractive and highly desirable.

**Good** – Normal wear and tear is visible, but home is well maintained, still attractive, desirable and useful.

**Fair** – Minor deterioration apparent due to both the climate and the deferred maintenance, less attractive but obviously useful.

**Poor** – Signs of structural deterioration, obvious missing or broken component items, definitely undesirable and marginally useful.

---

[2] The condition of the home is determined by evaluating the condition of each room of the house. Points are assigned based on the condition of each room, and the total number of points determines the overall condition of the home.

4

16. Mr. Banks testified that all of the issues shown in the pictures introduced by Debtor were taken into account in arriving at the value in his appraisal. He further testified that the issues with the mobile home are mainly, if not all, cosmetic. He stated that he did not see any evidence of water damage or mold in the home or any structural issues, but that the issues appeared to be the result of deferred maintenance.

17. Mr. Banks testified that in order to be rated as "fair," NADA guidelines require that the mobile home have issues caused by both deferred maintenance and climate. Mr. Banks testified that because it appeared to him that the issues with Debtor's mobile home were caused by deferred maintenance, and not also by climate, the home did not meet the criteria for "fair" condition.

18. Mr. Banks testified that he has recently been in the market for a mobile home similar to Debtor's and that the best price he has been able to find for such a home is $38,000.00.

19. Mr. Banks' appraisal includes a page entitled, "Accessories" on which Mr. Banks could select accessories with which the mobile home is equipped and assign values to those accessories. Mr. Banks assigned a total value of $2,216.00 to two porches, steps with a railing, and a 4 ton[3] central air conditioning system.[4] Debtor testified that she purchased the lumber to build both of the porches on her home, and her uncle built the porches for her.

20. The appraisal also includes a worksheet entitled, "Components". Mr. Banks assigned a total value of $5,700.00 to components contained in Debtor's mobile home. The total value included $266.00 for storm doors, $398.00 for a refrigerator, $66.00 for an ice maker, $254.00 for a free-standing range, $242.00 for drapes/curtains, and $160.00 for smoke detectors.

---

[3] Debtor testified that she believed her home had a three ton air conditioning system and selected that size for her air conditioning unit when completing her NADA report at the hearing.
[4] The Accessories worksheet also lists 206 linear feet of metal skirting on the mobile home; however, Mr. Banks assigned no value to the skirting due to the poor condition of it.

21. Mr. Banks' appraisal included a $1,180.00 discount for repairs needed to the home.

22. Attached to Vanderbilt's proof of claim is a Manufactured Home Promissory Note, Security Agreement and Disclosure Statement ("Security Agreement"). Page one of the Security Agreement contains the following chart:

| Description of Manufactured Home | New [X] Used [ ] | |
|---|---|---|
| TRADE NAME: GILES | ADDITIONAL ACCESSORIES AND FURNISHINGS: ITEM AND SERIAL # | |
| MODEL: LONESTAR | | |
| SERIAL NO: GM7660AB | | |
| SERIAL NO: | | |

23. Below the chart is a paragraph which states, "Buyer gives Seller a security interest in [t]he goods or property being purchased including the Manufactured Home as described above." Page 2 of the Security Agreement states, "Buyer gives Seller a security interest under the applicable certificate of title law and the applicable Uniform Commercial Code in the Manufactured Home and any property added or attached to it."

## CONCLUSIONS OF LAW

In order to be confirmed, a proposed chapter 13 plan must meet the requirements set forth in 11 U.S.C. § 1325. One such requirement, at issue here, is set forth in section 1325(a)(5)(B)(ii). That section states that the plan must pay each allowed secured claim "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim." Thus, section 1325(a)(5)(B)(ii) requires that a proposed plan pay the present value of a secured creditor's allowed secured claim. This Court has recently discussed section 1325(a)(5)(B)(ii) in a similar case:

> Utilization of this code provision is colloquially referred to as "cram down." In order to invoke the cram down option, the debtor, frequently through the filing of a plan of reorganization, proposes a value of the secured portion of

6

> a creditor's lien to be paid over the life of the plan while the debtor retains the collateral. The unsecured portion of the creditor's debt is then paid at the same percentage as general unsecured creditors, and discharged if the plan payments are completed.

*In re Eaddy*, 2016 WL 745277, at *4 (Bankr. D.S.C. Feb. 23, 2016) (internal citations omitted). A debtor typically bears the burden of establishing his plan meets the requirements of section 1325. *Id.*

The parties agree that the mobile home is not affixed to the real property and therefore is personal property. Section 506(a)(2) provides that in a chapter 13 case, the proper value for personal property securing an allowed claim is "the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing." For property purchased for personal, family, or household purposes, "replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined." 11 U.S.C. § 506(a)(2).

Debtor did not have an expert testify as to the value of the mobile home. Debtor testified as to her own opinion of the mobile home's value; however, when asked for the basis for her opinion of the value, Debtor was unable to articulate any basis for her opinion that the mobile home was worth $29,000.00. Although prompted by her counsel, Debtor was unable to recall seeing any appraisal performed on the mobile home by an appraiser that Debtor's counsel had originally intended to testify at the hearing. After testifying that she believed the value of the mobile home was $29,000.00, Debtor created an NADA valuation of the mobile home during the hearing. However, because Debtor testified this was the first time she had created such a report, and because the report was created after Debtor testified as to her opinion of value, her opinion could not have been based in any part on the report. Accordingly, because it does not appear to have any basis, the Court gives Debtor's $29,000.00 valuation of the mobile home no weight.

7

The Court also gives the NADA report created by Debtor during the confirmation hearing little to no weight. NADA reports are frequently used in bankruptcy courts and are generally admitted and often relied on by bankruptcy courts in determining value. *See Eaddy*, 2016 WL 745277, at *7 ("NADA valuations . . . are utilized with increasing frequently in bankruptcy courts and are generally accepted."); *In re McElroy,* 339 B.R. 185, 188 (Bankr. C.D. Ill. 2006) (stating that NADA report is admissible under Federal Rule of Evidence's Rule 803(17) hearsay exception and stating, "Bankruptcy courts in the Central District of Illinois have long recognized the NADA guide as 'the authoritative source that is most relevant and applicable to the valuation' of vehicles in Chapter 13 cases.") (citations omitted); *In re Brown*, 2012 WL 6021469, at *6 (Bankr. M.D. Ga. Dec. 4, 2012) ("[T]he Court notes that many courts recognize the use of NADA to establish value of vehicles pursuant to Rule 803(17) of the Federal Rules of Evidence, with appropriate adjustments made for mileage, condition and other factors. This Court has accepted such evidence in the past.").

Mr. Banks testified, after watching Debtor create the NADA report, that some of the characteristics of the mobile home Debtor input to create the report were incorrect. Mr. Banks testified that the size of the mobile home Debtor used to create the report, although a legal size for the mobile home and the size listed on her sales contract, was not the actual size of Debtor's home. Additionally, Debtor included a 3 ton air conditioning system in her report, while Mr. Banks' appraisal uses a 4 ton model. Debtor also selected that the mobile home was in "poor" condition. While the mobile home certainly has some problems, it does appear that most problems are cosmetic and repairable. Accordingly, the home does not meet the criteria for "poor" condition. Based on the input of inaccurate information and the improper condition rating of "poor" used to

create Debtor's NADA report, the Court finds that the NADA report created by Debtor is inaccurate and affords it little to no consideration in arriving at the mobile home's value.

Debtor's counsel argued that Vanderbilt's security interest does not extend to the components and accessories with which the home is equipped and that the value of the home should be adjusted as a result. However, the Security Agreement states that Vanderbilt's security interest extends to the mobile home, the property purchased, and "any property added or attached to it." The language contained in Vanderbilt's Security Agreement is broad enough to encompass the components with which the home is equipped, as well as the porches, steps, and air conditioning system. No adjustment is made to the valuation of the home to exclude any components or accessories.

Mr. Banks appraised Debtor's mobile home at $44,600, which the Court believes is higher than the appropriate starting price for valuation of Debtor's home. The NADA value for the base "box" of a home is not dispositive of what a retail merchant would charge. On the other hand, Mr. Banks testified that the best price he had been able to locate for a mobile home similar to Debtor's was $38,000. This price was based in part on Mr. Banks' connections in the mobile home industry. The standard for purposes of valuation under section 506(a)(2) does not take into consideration any special connections an individual may have which would help them obtain a more favorable price. The Court is left with the task of determining what the starting price for its valuation of Debtor's home should be, and based on the evidence presented, finds that the starting price for Debtor's home should fall somewhere in between $44,600 and $38,000. Accordingly, the Court uses $40,000 as the starting point for valuation of Debtor's mobile home.

The Court then adjusts the value of the mobile home downward due to the mobile home's condition. Mr. Banks rated the mobile home as good, which is described in NADA condition

guidelines as "normal wear and tear is visible, but home is well maintained, still attractive, desirable and useful." Debtor's home does not meet these criteria. However, based on the pictures submitted by Debtor and the testimony of Mr. Banks, it does appear that the majority of, if not all, of the damage to Debtor's home is cosmetic and due to deferred maintenance. No evidence of damage caused by climate or any structural problems with the home was presented, and Debtor testified that she was not aware of any structural problems with the home. As a result, Debtor's home also does not meet the criteria for "fair" condition. It appears that Debtor's home falls somewhere between "good" and "fair" condition, but is closer to "fair" condition than "good". Thus, the Court applies a discount of $2,000 to reflect the mobile home's actual condition.

Finally, the value of Debtor's home is discounted to compensate for warranties or service agreements that would be included in a replacement of the mobile home. *See Eaddy*, 2016 WL 745277, at *7 ("[B]ased on [*Associates Comm. Corp. v. Rash*'s[5]] caution against including value for services that would be included in a resale but not held by the debtor retaining the collateral, the Court further discounts the valuation by [the appraiser's] $1,000 estimate for a home warranty or related retailer services that would come from a purchase."). Mr. Banks testified that he included a value of approximately $1,000.00 for a home warranty; thus, the Court subtracts an additional $1,000 from the value of the home.

---

[5] 520 U.S. 953 (1997).

10

## CONCLUSION

With a starting value of $40,000 and the application of discounts for the home's condition and the home warranty, the value of Debtor's mobile home is $37,000.00. Debtor's plan uses a value for the mobile home of $27,100 and therefore, confirmation of Debtor's plan filed January 22, 2016 is denied. Debtor is given fourteen (14) days from the date of entry of this order to propose an amended plan.

AND IT IS SO ORDERED.

**FILED BY THE COURT**
**05/17/2016**



Entered: 05/18/2016

David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina